# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**Frederick Graessle,**

      **Plaintiff,**

                                          **Case No. 2:03-CV-00758**
**v.**                                              **JUDGE SMITH**
                                              **Magistrate Judge King**

**Nationwide Credit Inc.,** *et al.***,**

      **Defendants.**

## OPINION AND ORDER

Plaintiff Frederick Graessle ("Plaintiff" or "Graessle") brings this action against Defendants Nationwide Credit, Inc., NCI Resource Management, Inc., and Nationwide Credit, Inc., dba NCI Resource Management, Inc. ("Defendants" or "NCI"). Plaintiff asserts claims of age and religious discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, Ohio Revised Code Chapter 4112 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) as well as a state law claims for spoliation, breach of contract, promissory estoppel and public policy. Defendants have moved for summary judgment with respect to all claims (Doc. 175). In addition, Plaintiff has filed a Motion for Leave to Amend Complaint (Doc. 187); and a Motion for Leave to File Surreply (*Instanter*) in Support of Memorandum Contra Defendants' Summary Judgment Motion (Docs. 188, 190). For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 175), **DENIES** as moot Plaintiff's Motion for Leave to Amend Complaint (Doc. 187), and **GRANTS** Plaintiff's Motion for Leave to File Surreply (*Instanter*) in Support of Memorandum Contra Defendants' Summary Judgment Motion (Docs. 188, 190).

## I. FACTUAL BACKGROUND

Defendant NCI is engaged in the business of credit collections.  In 2000, NCI began developing a new division called the Healthcare Division which was to focus on credit collections for clients in the healthcare industry.  Defendants hired Paula Boyer as the Senior Vice President of the Healthcare Division.  Ms. Boyer was responsible for sales, client services and operations of the Division.  In 2000, after Ms. Boyer was hired, NCI established the Division as a separate entity from the rest of NCI.  For example, NCI developed separate cost centers, different incentive plans, and independent revenue goals for the Healthcare Division.  Also, the Healthcare Division had unique compliance issues such as HIPPA.  As part of the creation of the Division, Ms. Boyer hired Plaintiff Graessle as Vice President of Sales and Marketing.

Prior to joining Defendant NCI, Plaintiff Graessle served as Regional Vice President for Payco and was responsible for supervising fifteen employees.  On April 17, 2000, Plaintiff Graessle began his employment as the Vice President of Sales in the Defendants' Healthcare Division.  Plaintiff was a Christian and forty-four years old at the time of hiring.  Plaintiff reported directly to Paula Boyer.

After Plaintiff was hired, he in turn hired and supervised four Directors of Sales: Catherine Feeley, Paul Danahey, Lorraine Ryan, and Kristina Hinton.  Plaintiff also supervised independent contractors who worked with NCI, including Ron Danelz and Mike Horn.  NCI independent contractors were not employees of NCI but had a contract to refer business to NCI.

Plaintiff claims he was discriminated against by Ms. Boyer based on his Christian faith.  Ms. Boyer is of Jewish faith.  Plaintiff testified that his basis for his religious discrimination claim was (1) three conversations he had with Ms. Boyer in which religion was mentioned, and (2) Plaintiff's speculation that Jeffrey Strauss, an employee of CAP Gemini and contact of Ms. Boyer (apparently of Jewish faith), would replace him. (Graessle Depo. at 190-191, 211-212).

2

In late 2000, Plaintiff Graessle alleges that Plaintiff's business contact, Jeffrey Strauss, visited NCI's office several times, partially for business, but also to interview with Ms. Boyer for a position with NCI.   Subsequent to one of Strauss' visits, and as Plaintiff and Ms. Boyer were attempting to coordinate dates for a follow-up meeting, Ms. Boyer asked Plaintiff to communicate to Jeffrey Strauss that she was Jewish because Ms. Boyer was attempting to curry favor with Mr. Strauss, who was a potential source of business referrals for Defendant NCI. (Graessle Depo. at 203-216).  In deposition, Plaintiff described the first conversation as follows:

> A.  That conversation entailed – and the subject came up because, as I recall, we were looking at alternative dates for follow-up meetings or something, and Paula had said, well, I can't make it that week because of the Jewish holiday, and I said, if that creates a conflict for you, that's going to be a conflict for Jeff.  And she said, What? You know Jeff's Jewish?  And I said, Yes.  And she said, Well you tell him that, you know, I'm Jewish, and there's an unwritten rule amongst Jewish people that we take care of members of the tribe.  And I kind of was – I never heard that comment before, tribe.

(Graessle Depo. at 204-205).  On the second occasion, Ms. Boyer asked Plaintiff to remind Mr. Strauss that she was Jewish and then asked Plaintiff if he told Mr. Strauss that she was Jewish on the third occasion.  (Graessle Depo. at 206-211).  Ms. Boyer made no other comments regarding her religion to Plaintiff.  (Graessle Depo. at 211).

In October 2002, one month after Plaintiff's termination, Ms. Boyer offered to Mr. Strauss an Independent Sales Contractor's opportunity and sent Mr. Strauss an agreement specially tailored to him.  (Pl's Memo. in Opp. at 6; Exhibit E (Strauss Aff.)).  Mr. Strauss was not, and has never been employed by NCI.  (Strauss Decl.).

Defendants allege that in the months prior to Plaintiff's termination, NCI's Healthcare Division was being continuously restructured to minimize ongoing losses in the Division. Plaintiff, at the time of his termination, was supervising Catherine Feeley and Paul Danahy, the

only two Directors of Sales left in the Defendants' Healthcare Division.

On September 27, 2002, Plaintiff and Catherine Feeley were terminated. Plaintiff learned of his termination during a September 27, 2002 conference call with Ms. Boyer and Roger Bruce, Director of Human Resources. During this call Plaintiff asked if there were any sales positions available with NCI and Mr. Bruce responded in the negative. Plaintiff was told that his termination was because of "a companywide reorganization [and] that healthcare was losing money . . . ." (Graessle Depo. at 179, Ex. 11; Bruce Depo. at 29-30).

Defendants assert that both Plaintiff's and Ms. Feeley's termination was part of a reduction in force in Defendant NCI's Healthcare Division. More specifically, Defendants allege the reduction in force occurred to cut costs because the Healthcare Division was losing money, and NCI was on the verge of bankruptcy in 2002. (Def's Mot. for Summ. J. at 3 and Boyer Depo. at 85-89, 102-103). Mr. Bruce testified that the Healthcare Division continually lost money and Defendants have submitted documentation demonstrating that the Division was losing money and that the Division's actual revenue for 2002 was 36% below its budgeted goal. (Bruce Depo. at 17-18; NCI 000879-000880, 000882, 000951-000964, and 000230-000237). Ms. Boyer further testified that Plaintiff's position was selected for elimination because the Healthcare Division no longer needed a vice president to manage a sales force. (Boyer Depo. at 98-100).

Plaintiff alleges that his termination of September 2002 was the result of age discrimination. At the time of his termination, Plaintiff was forty-seven years of age. Plaintiff's supervisor, Ms. Boyer, was responsible for hiring and firing Plaintiff and was fifty-five years of age when Plaintiff was terminated. Plaintiff testified that the basis for his age discrimination claim is that Defendants terminated him and retained Paul Danahy, who was thirty-nine years of

4

age when Plaintiff was terminated. (Graessle Depo. at 179, 181, 192). Plaintiff assumes that Mr. Danahy replaced him, but was never told that by Defendant NCI's management. (Graessle Depo. at 189-190). Mr. Danahy was a Director of Sales and was supervised by Plaintiff prior to Plaintiff's termination. After Plaintiff's termination, no one was hired into Defendants' Healthcare Division's sales department. Ms. Boyer and Mr. Danahy began working within territories previously assigned to Plaintiff and Ms. Feeley. Defendants assert that Plaintiff's position at NCI was eliminated and that neither Mr. Danahy nor anyone else replaced Plaintiff. Defendants allege that instead, Mr. Danahy remained employed by NCI as the sole salesperson, not a supervisor, and reported directly to Paula Boyer after NCI eliminated Plaintiff's position. (Def's Mot. for Summ. J. at 5-6; Danahy Depo. at 28-29, 55, 65). In 2004, Paul Danahy quit and was not replaced. Thereafter, only Ms. Boyer did sales on behalf of Defendants' Healthcare Division. In July 2005, Defendant NCI sold its Healthcare Division to Argyle Solutions, Inc.

## II. SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at

5

trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[1] The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party

---

[1] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

"cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id., quoting Liberty Lobby*, 477 U.S. at 257. The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id., quoting Matsushita*, 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III. DISCUSSION

As a preliminary matter, the Court grants Plaintiff's Motion for Leave to File Surreply (*Instanter*) in Support of Memorandum Contra Defendants' Summary Judgment Motion (Docs. 188, 190). The Court has considered Plaintiff's Surreply and is not persuaded by it.

Plaintiff Graessle has asserted claims of age and religious discrimination under the ADEA, Ohio Revised Code Chapter 4112, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e). More specifically, Plaintiff alleges (1) he was wrongfully terminated based upon age; (2) he was wrongfully terminated based upon his Christian religion; and (3) NCI's Healthcare Division had a facially neutral policy/practice that disproportionately affected employees over forty years of age. In addition, Plaintiff has asserted state law claims for spoliation, breach of contract, promissory estoppel, and public policy. Defendants argue that they are entitled to summary judgment on each of Plaintiff's claims. The Court will address each

of Defendants' arguments in favor of summary judgment in turn.

## A.    Disparate Treatment on the Basis of Age and Religion

In considering age and religious discrimination claims under O.R.C. Chapter 4112, the Ohio Supreme Court has adopted the tests established by the federal courts for assessing claims under parallel anti-discrimination statutes. *Plumbers and Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission*, 66 Ohio St.2d 192, 196 (1981). Thus, the Court will address Plaintiff's age discrimination claims under O.R.C. Chapter 4112 and the ADEA together. Likewise, Plaintiff's religious discrimination claims under O.R.C. Chapter 4112 and Title VII will be addressed together.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(A)(1). Similarly, the ADEA provides that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate with respect to compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a). The ADEA applies to individuals forty years of age or older. 29 U.S.C. § 631(a). A plaintiff who brings a claim under the ADEA must prove that age was a determining influence in the adverse action that the employer took against him. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000); *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 514 (6th Cir. 1991).

In order to establish an employment discrimination case, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment. *White v. Columbus Metropolitan Housing Auth.*, 429 F.3d

232, 238 (6th Cir. 2005).  Plaintiff has not offered direct evidence of age or religious discrimination.  Consequently, the Court will determine whether Plaintiff has presented a *prima facie* case of age or religious discrimination under the *McDonnell Douglas* burden shifting paradigm.

The elements of a *prima facia* case of employment discrimination based on age or religion are: (1) that the plaintiff is a member of a protected class (over 40 years of age for an age discrimination claim); (2) that the plaintiff was qualified for the position; (3) that the defendant subjected the plaintiff to an adverse employment action; and (4) that the defendant did not subject similarly situated persons outside the protected class to such adverse action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993);  *Kesselring v. United Technologies Corp.*, 753 F. Supp. 1359, 1364 (S.D. Ohio 1991); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 940 (6th Cir. 1987); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

This burden-shifting framework is intended to be flexible in differing factual circumstances.  *See Christian v. Wal-Mart Stores, Inc,.* 252 F.3d 862, *869 -870 (6th Cir. 2001) *citing Burdine,* 450 U.S. at 254 n. 6.  For example, in a reduction in force case, the *prima facie* framework is modified such that the plaintiff is not required to plead the fourth prong because in a reduction-of-force situation, the plaintiff is not in fact replaced. *Godfreson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1999) (*citing Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir. 1998).  "Instead, the plaintiff must present additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Godfreson*, 173 F.3d at 371 (*quoting Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (internal quotations omitted)).

 If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to

come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff, which will necessarily be the alleged reduction in force.  *Id*; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  The burden then returns to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See id.*; *Burdine*, 450 U.S. at 253.  "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens.  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the  plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

The parties agree that Plaintiff was a member of a protected class, that he was qualified, and that he was subjected to an adverse employment action.  They disagree, however, as to whether Plaintiff was terminated as part of a legitimate reduction in force.  In addition, if Plaintiff was terminated as a part of a reduction in force, the parties dispute whether Plaintiff has offered the requisite additional direct, circumstantial, or statistical evidence of age and religious discrimination and whether Plaintiff can establish that the reduction in force was pretextual.

### 1.        Was Plaintiff terminated as part of a reduction in force?

Plaintiff Graessle disputes Defendants' claim that he was discharged in connection with a reduction in force.  (Pl's Memo. in Opp. at 12).  More specifically, Plaintiff contends that no reduction in force occurred because Plaintiff was replaced by Mr. Danahy, a younger employee. (Pl's Memo. in Opp. at 13-17). This Court disagrees.

In *Barnes*, the Sixth Circuit stated that a "work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." 896 F.2d at 1465.  In the instant case, Defendants allege the reduction in force occurred to cut costs because the Healthcare Division continually lost money, and NCI was on

the verge of bankruptcy in 2002. Defendants further allege that Plaintiff's position was selected for elimination because the Healthcare Division no longer needed a vice president to manage a sales force.

Plaintiff correctly points out that an alleged reduction in force is invalid when the terminated employee is replaced. The *Barnes* Court set forth guidelines for determining whether the terminated employee was "replaced":

> a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Id*. (*citing Sahidi v. Reynolds Chemical*, 636 F.2d 1116, 1117 (6th Cir. 1980)).

Plaintiff relies on *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519 (6th Cir. 1997) to support his argument that he was replaced by Mr. Danahy. (Pl's Memo. in Opp. at 16). The *Tinker* Court held that the promotion of a younger employee from part-time to full-time, which "fundamentally change[d] the nature of his employment," was analogous to hiring a new employee to assume the plaintiff's duties, and thus constituted a replacement. 127 F.3d at 521-22. Significantly, the younger replacement employee in *Tinker* did not merely assume additional tasks while continuing to perform his prior responsibilities, but instead was promoted from part-time to full-time, which caused his position to be "fundamentally changed."

In contrast to the facts in *Tinker*, the record in the instant case supports Defendants' position that Plaintiff was not "replaced" by Mr. Danahy. Plaintiff remained Vice President of Sales until his termination. Prior to his termination, Plaintiff performed management duties and also made sales. It is undisputed that no one was hired to replace Plaintiff. Instead, after Plaintiff's discharge, Ms. Boyer and Mr. Danahy, while maintaining their prior job titles and

11

responsibilities, assumed Plaintiff's duties.  Ms. Boyer assumed all of Plaintiff's management duties and Mr. Danahy took care of Plaintiff's sales contacts.  Thus, Ms. Boyer's and Mr. Danahy's assumption of these additional duties did not fundamentally change the nature of their employment with NCI.  Accordingly, the reduction-in-force analysis is the appropriate standard in the instant case.

Because Plaintiff was terminated as part of a genuine reduction in force, he need not plead the fourth prong of the prima facie test because Plaintiff was not replaced.  Instead, in order to survive summary judgment, Plaintiff must establish that there was "additional direct, circumstantial, or statistical evidence tending to indicate that Defendants singled him out for termination for impermissible reasons.

**2.** **Was there additional evidence indicating that Defendants singled Plaintiff out for discharge for impermissible reasons?**

**a.** **Religious Discrimination**

Plaintiff contends that Ms. Boyer's comments regarding taking care of members of "the tribe" qualifies as direct evidence that NCI, through Ms. Boyer, discriminated against Plaintiff. This Court disagrees and finds that Plaintiff Graessle has not presented direct evidence of religious discrimination.

"In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "For example, a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.

2000).  However, "isolated and ambiguous statements ... are too abstract, in addition to being irrelevant and prejudicial, to support a finding of discrimination."  *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993) (*quoting Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989)).  "'[S]tatements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden' of demonstrating animus." *Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 550-551 (6th Cir. 2004) (*quoting Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)).  In other words, the Court must examine not only the substance of any allegedly discriminatory evidence, but also determine whether there exists any causal connection between the purported animus and the adverse employment action.

 In the present case, Plaintiff bases his religious discrimination claim on three comments made by Ms. Boyer.  The first and second comments were made with the purpose of getting Plaintiff to relate to Mr. Strauss that Ms. Boyer (like Mr. Strauss) was Jewish in an attempt to curry favor with Mr. Strauss, who was a potential source of business referrals for NCI.  Ms. Boyer, for her third comment, inquired whether Plaintiff had told Mr. Strauss that she was Jewish.  The latest of the three comments occurred in April 2001, over a year before Plaintiff's September 2002 termination.  The Court finds that Ms. Boyer's comments were isolated, innocuous, and unrelated to the decision of whether to terminate Plaintiff's employment.  Consequently, the comments by Ms. Boyer are not evidence of religious discrimination.

Plaintiff's second basis for his religious discrimination claim is that Mr. Strauss was offered an independent contractor position in October 2002.  Plaintiff claims that he should have been offered the position.  Defendants argue, and this Court agrees, that NCI's failure to offer Plaintiff an independent contractor position is irrelevant.

"Where an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company . . . or to "recall laid-off employees when a new position opens up." *Williams v. Tyco Elec. Corp.*, 161 Fed.Appx. 526, 537, (6th Cir. 2006) (*quoting Almond v. ABB Industrial Systems, Inc.,* 56 Fed.Appx. 672 (6th Cir. 2003) (internal citations and quotation marks omitted). Thus, NCI had no duty to offer an independent contractor position to Plaintiff. Mr. Strauss did not accept Ms. Boyer's offer, and no other individuals were hired as independent contractors. Regardless, independent contractors who worked with NCI were not employees of NCI but had a contract to refer business to NCI. Thus, even if Mr. Strauss had accepted Ms. Boyer's offer, Mr. Strauss would not have "replaced" Plaintiff. Consequently, Ms. Boyer's offer of an independent contractor position to Mr. Strauss is not evidence of religious discrimination.

Accordingly, this Court finds that there is no indication that unlawful discrimination motivated Defendants to eliminate Plaintiff's position and Defendants are entitled to summary judgment on Plaintiff's religious discrimination claim.

### b.    Age Discrimination

As set forth *supra*, in order to establish a *prima facie* case of age discrimination, Plaintiff must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [Plaintiff] for discharge . . . ." Plaintiff has presented no such evidence, however, nor can any readily be discerned from the record before the Court. Though the Court is not unsympathetic to Plaintiff, "if [he] was truly singled out for discharge because of age he [ ] should be able to develop enough evidence through the discovery process or otherwise to establish a prima facie case." *See Barnes,* 896 F.2d at 1465-66. Given that Plaintiff has not done

14

so, and that he was terminated as part of a genuine reduction in force, the Court finds that he has failed to establish a prima facie case of age discrimination and that Defendants are entitled to summary judgment on this claim.

### 3.    Was the reduction in force pretextual?

Even if Plaintiff had established a prima facie case of age discrimination, however, it would still be incumbent upon him to show that Defendants' proffered reason for the termination--the reduction in force--was pretextual.  *See Godfredson,* 173 F.3d at 373.  "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998).  "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.'" *Id.* (*quoting Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)).  In examining whether the stated reason is pretext, the Court must determine whether the employer reasonably relied on the particularized facts before it at the time it made the employment decision.  *Smith*, 155 F.3d at 807.  The employer is not required to show that it left no stone unturned; rather, the issue is whether the employer made a reasonably informed and considered decision before taking the

15

adverse employment action. *Id.* The Court should not blindly accept the proffered reason as honest. *Id.* If the employee adduces evidence establishing that the employer failed to make a reasonably informed and considered decision, then its decisional process is "unworthy of credence," and any reliance by the employer on such a process cannot be deemed "honestly held." *Id.* at 807-08.

In the instant case, Plaintiff contends that he has produced "evidence of material inconsistencies" amounting to "extensive evidence of pretext." (Pl's Memo. in Opp. at 17-25). The alleged inconsistencies are regarding when and why Plaintiff was replaced and also regarding whether the Vice Presidents' positions were eliminated companywide, which Plaintiff claims amounts to "extensive evidence of pretext."*Id.*

The first argument advanced by Plaintiff is that Ms. Boyer testified that Plaintiff was terminated as part of the reduction in force and then changed her testimony to say that he was terminated because of his failure to meet his individual performance goals. (Pl's Memo. in Opp. at 20-21). This Court has previously rejected, and again rejects this argument which is based upon inaccurate descriptions of deposition testimony. The

Court explained in its December 5, 2005 Opinion and Order:

> Read in its entire context, Ms. Boyer did not testify that it was plaintiff's failure to meet "his" goals that was a precipitating factor in his termination. Instead, Ms. Boyer testified that the company did not meet its goal, thereby necessitating a reorganization that eliminated plaintiff's position. In response to questions regarding plaintiff's sales, Ms. Boyer testified:
>
> > A.    We did not make our numbers. If he would have generated the sales, we would not be sitting here right now.
> >
> > Q.    Well, Paul didn't meet his numbers, did he?
> >
> > A.    I don't know. That was something that was [plaintiff's] responsibility. I hold the
> >
> > person that was in the position [plaintiff] was in to make sure that we met our new sales numbers.
> >
> > Q.    So you terminated [plaintiff] because he didn't meet his goals?
> >
> > A.    No, I didn't. We didn't meet our goal; and because of that, we had to do a reorganization. We reorganized and we eliminated that position.
>
> Boyer Depo. at 102-03, attached to *Defendants' Notice of Filing of Supplemental Evidence*; Doc. No. 110.
>
> Because plaintiff's failure to meet his individual performance goals was not a factor in his termination, discovery related to the individual performance goals of other personnel are not relevant to plaintiff's claims.

(Doc. 155 at 6).  Thus, Ms. Boyer did not testify that Plaintiff was terminated because of his failure to meet individualized sales goals. Plaintiff's mischaracterization of the record does not create a question of fact on this point.  This is not evidence of pretext.

The second argument advanced by Plaintiff, like the first, has been previously rejected by this Court.  Plaintiff claims that testimony by Roger Bruce and Bruce Wright, as well as NCI's position statement to the EEOC, create a question of fact over whether Plaintiff was terminated for his individual sales performance.  This Court, in its April 27, 2006 Order denying Plaintiff's Motion to Reconsider, set forth its reasoning for rejecting Plaintiff's argument:

> Bruce Wright did not participate in the decision to terminate plaintiff's employment with NCI. Doc. No. 159; *Deposition of Bruce Wright*, at 17. However, he was the individual who drafted defendants' response to plaintiff's EEOC charge ["EEOC Response"], which required him to investigate the charges made by plaintiff. *Id.*, at 27-29.

> Plaintiff contends that the "EEOC Response unequivocally states that Plaintiff's, and his staff's, failure to procure sufficient sales was a primary indicator in making the decision to terminate him." *Plaintiff's Motion for Reconsideration*, at 3. After careful review of the EEOC Response and Wright's deposition testimony related to it, the Court disagrees.

> Plaintiff relies on the following language in the EEOC Response for the proposition that plaintiff was terminated for failure to meet his individual performance goals:

>> As explained to Mr. Graessle at the time of discharge, stagnated sales and the inability to secure new business were the primary indicators that led to this decision.

> Doc. No. 159; *Exhibit 17* attached to *Deposition of Bruce Wright*. Mr. Wright elaborated on the terms used by him:

>> Q.      When you say stagnated sales and the inability to secure new business were the primary indicators that led to this decision, did you mean stagnated sales and inability to get new business in healthcare [the division in which plaintiff was employed]?

>> A.      Yeah, it would have been related to healthcare and the

organization, yes.

Q.    Okay.

A.    Throughout the organization. But that may be particularly
      with healthcare as I recall.

Q.    So is it fair to say based on the information you obtained
      from Roger Bruce, your understanding was that part and
      parcel to Mr. Graessle's termination was that – an inability
      to generate sales. Is that fair?

A.    No. That is not fair.

Q.    Well, how would you – how do you interpret the sentence
      that you wrote there, stagnated sales?

A.    Stagnated sales was a part of the business decision which is
      what I referred to several times in the statement, the
      business decision to restructure the department, stagnated
      sales in – throughout the organization.

Id. at 43-44.

* * * *

Plaintiff also argues that, in his deposition testimony, the Senior Vice
President of Human Resources for NCI, Roger Bruce, "conceded that Defendants'
EEOC Response indicates that Plaintiff's termination was based, at least in part,
on Plaintiff's sales performance." *Plaintiff's Motion for Reconsideration*, at 3.
After careful review of Mr. Bruce's testimony, the Court again disagrees.

Mr. Bruce did not participate in the decision to terminate plaintiff nor did
he participate in the investigation of plaintiff's EEOC charge or the drafting of the
EEOC Response. *Id.*, at 80. His only involvement in plaintiff's termination was to
explain the severance package to plaintiff. *Id.*, at 80-82. The testimony upon
which plaintiff relies was made in response to a question asking Mr. Bruce to
speculate about the meaning of Bruce Wright's terms, made in the EEOC
Response, "stagnated sales and the inability to secure new business."

19

Q.      So you would expect [Mr. Wright] to only include [in the
        EEOC Response] information that he obtained during his
        review process; correct? I'm not asking you to think about
        why he put that there. I'm asking, as his supervisor, would
        you expect him to only put information that he obtained
        from supervisors during his review process.

A.      Well, whatever his – whatever process he went through to
        respond to this EEOC charge, I'm sure it was based on
        conversation with somebody else.

Q.      Okay. He wouldn't just –

A.      Or – no, he wouldn't make it up is the point.

Q.      Right. And in reading that, would it be your impression in
        reading that that Mr. Graessle may have been selected as
        part of that overall directive to reduce salary because of his
        performance?

A.      That could very well have been the case, yes. Doc. No.
        159; *Deposition of Roger Bruce*, at 39-40. Any ambiguity
        reflected in  this speculation, however, is definitively laid
        to rest by other portions of this deponent's testimony:

Q.      Okay. How long – as you're probably aware, during 2002
        it's been represented to my client among other things that
        one of the reasons for his termination was based on a
        company-wide reorganization.

A.      My memory serves me that that was the only reason. You
        said that was one reason. To my knowledge, that was the
        only reason.

        *Id.* at 29.

(Doc. 173 at p. 4-6).  Thus, the testimony of Roger Bruce and Bruce Wright is consistent with

the EEOC position statement.  Again, this is not evidence of pretext; Defendants have not

changed the reasons for Plaintiff's termination.

Plaintiff next seeks to establish pretext by claiming that Defendants' CEO, Michael Lord,

gave inconsistent testimony regarding the timing of the decision to terminate. (Pl's Memo. in

Opp. at 22-24).  Plaintiff cites to an organizational chart dated July, 2002 that has an "X" above

Plaintiff's name.  Though Mr. Lord testified that the handwriting on the July, 2002 document

was his, Mr. Lord was not asked what the document meant, whether it related to Plaintiff's

termination, or even when Mr. Lord put his handwriting on the document. (Lord Depo. at p. 33-

34).  In short, this document is not evidence of pretext; it does not demonstrate that the decision

to terminate Plaintiff was made prior to September 2002, as Ms. Boyer testified. (Boyer Depo. at

114-115).  Additionally, Plaintiff has failed to offer an explanation of how a dispute regarding

the timing of the decision would give the jury a basis to infer the reduction in force was

pretextual.

Finally, Plaintiff contends that inconsistent testimony by Ms. Boyer and Mr. Lord

regarding the existence of sales vice presidents post-reduction in force at NCI establishes

pretext. (Pl's Memo. in Opp. at 24-25).  As Defendants point out, however, review of the

testimony upon which Plaintiff relies reveals that Plaintiff failed to ask critical follow-up

questions which would be necessary to determine whether or not Mr. Lord's testimony actually

conflicted with Ms. Boyer's:

> Q:     So those [Divisions] which you can remember would be the American
>        Express – I'm using the lexicon, I know, pretty freely – American Express
>        division, MCI division, small balances group or division?
>
> A:     Yes.

Q:     And the healthcare group or division?

A.:    Sounds about right.

Q:     These questions all refer to that period of time when you were still the CEO.

A:     Yes.

Q:     Did the American Express division have its own vice president?

A:     Yes.

Q:     And did the MCI group have its own vice president?

A:     Yes.

Q:     Likewise, did the small balances group or division have its own vice president?

A:     Yes.

Q:     And likewise, did the healthcare division or group have its own vice president.

A:     It did.

Q:     Within those divisions, so far as you can recall, Michael, did any other person within a division have the title vice president?

A:     I wouldn't remember.

(Lord Depo. at 40). Mr. Lord's testimony does not establish that Plaintiff's position as Vice

President of Sales continued or that Plaintiff's position was filled after the reorganization as

Plaintiff seems to suggest.  Ms. Boyer was employed as Senior Vice President of the Healthcare Division; Plaintiff was Vice President of Sales in the Healthcare Division.  Mr. Lord's testimony could be that each Division has a Senior Vice President - - which remained true even after Plaintiff was terminated.  Consequently, Mr. Lord's testimony does not establish a basis to infer the reduction in force was pretextual.

In conclusion, the Court finds that Plaintiff has failed to adduce evidence from which a rational trier of fact could reasonably infer that Defendants' proffered reason for terminating Plaintiff--the reduction in force--had either no basis in fact or was not the actual reason.  Accordingly, Plaintiff Graessle is unable to establish pretext as a matter of law.  For this additional reason, Defendants are entitled to summary judgment in its favor on Plaintiff's age and religious discrimination claims.

**B.     Disparate Impact**

Plaintiff claims that Defendants have a neutral cyclical policy/practice of hiring seasoned salespersons and firing them after two years in order to take their client contacts. (Pl's Memo. in Opp. at 26-29).  Plaintiff claims that this policy or practice disproportionately affects sales employees over the age of 40. (Pl's Memo. in Opp. 29-30).

A disparate impact analysis is appropriate when a plaintiff claims that an employer's facially neutral policy adversely affects a protected class.  *Griggs. v. Duke Power Co.,* 401 U.S. 424, 431 (1971).  Typically, the disparate impact analysis is used in a class action, but the Sixth

Circuit has stated that it may also form the basis for an individual claim.  *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 576-77 (6th Cir. 2004) (*citing Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1048 (6th Cir. 1998)).

A *prima facie* case is established when: (1) plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005) (*citing Johnson v. U.S. Dept. of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994).  Once a *prima facie* case is proven, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment practice.  *Johnson*, 30 F.3d at 48.  The burden then shifts back to plaintiff to prove either pretext or that a less discriminatory practice existed which would achieve the same business ends. *Id.*

In the instant case, Defendants argue, and this Court agrees, that Plaintiff has failed to establish either of the two *prima facie* elements of a disparate impact claim.

### 1.    Specific Employment Practice

As set forth *supra*, a plaintiff in a disparate impact claim must first identify a specific employment practice that, although neutral on its face, is applied in a way that has an adverse effect on a protected class.  Plaintiff claims that Defendants have a cyclical practice of hiring a seasoned sales force every few years, "sapping the individuals' contacts, and then terminating him/her . . . ." (Pl's Memo. in Opp. at 30).  Defendants dispute that it has such a practice and asserts that there is no evidence establishing the existence of the alleged business practice or that the alleged practice occurred in the Healthcare Division. (Def's Reply at 18-20).

Defendants do not have a stated or written policy of cyclically hiring and firing seasoned sales forces.  Instead, Plaintiff relied on the testimony of Ms. Chadwick and Mr. Lord in reaching his conclusion that Defendants have such a policy. (Pl's Memo. in Opp. at 27-29).  The Court has reviewed the testimony of Ms. Chadwick and Mr. Lord and finds that there is insufficient evidence to conclude Defendants have such a policy, but more importantly, the Court finds that there is undisputed evidence demonstrating that even if Defendants had such a policy, it was not employed in the Healthcare Division.  Ms. Chadwick, who was not involved in the decision to terminate Plaintiff, testified that in her tenure from 1997 through the present, she had seen the "wave" of hiring sales staff and letting them go "because the company has struggled from its beginnings." (Chadwick Depo. at 47-50).  Ms. Chadwick did not, however, testify that the employees hired in these "waves" were of a certain age, nor does she use the term "seasoned."  Moreover, Ms. Chadwick does not testify that this happened in the Healthcare Division.  Likewise, Plaintiff has inaccurately described Mr. Lord's testimony.  Read in context, Mr. Lord's testimony has nothing to do with a cyclical business practice, but instead concerns his definition of the term critical mass and is more properly described as a general discussion of how to reach profitability in a business.  (Lord Depo. at 16-18).

Even if this Court accepts Plaintiff's argument that Defendants had such a policy, Plaintiff's disparate impact claim must fail because the undisputed evidence demonstrates that such a policy was not applied in the Healthcare Division.  "[A]n individual plaintiff arguing a disparate impact theory must show that the challenged policy directly disadvantaged him in some fashion." *Bacon*, 370 F.3d at 577 (*citing Bowdish v. Cont'l Accessories, Inc.*, 1992 WL 133022, *5 (6th Cir. 1992) (noting an "individual plaintiff in an employment discrimination case

must present some evidence that demonstrates that his or her *individual* discharge was the result of discrimination") (citations omitted)).  In the instant case, Defendants created the Healthcare Division in 2000.  Plaintiff was one of the individuals who hired the sales representatives that were employed in the Healthcare Division.  The evidence shows the Healthcare Division continually lost money and the sales staff was decreased through attrition and a reduction in force.  Ultimately, the Healthcare Division was sold to Argyle Solutions, Inc.  *It is undisputed that Defendants did not hire new sales people from the date of the reduction in force to the sale of the Division.*[2]  Thus, Defendants did not employ the alleged policy of cyclically hiring and firing seasoned sales forces in order to sap the individuals' clients in the Healthcare Division. Plaintiff consequently lacks standing to assert a disparate impact theory claim since he has failed to identify a particular employment policy or practice which resulted in his termination. Accordingly, Defendants are entitled to summary judgment in their favor on Plaintiff's disparate impact claim.

## 2.      Statistical Evidence

Even if the Court were to find that Plaintiff has established the first *prima facie* element of a disparate impact claim, his claim must fail because he is unable to establish the second element which requires Plaintiff to utilize relevant statistical analysis to prove that the challenged practice has an adverse impact on a protected group.

---

[2]For this reason, the "less discriminatory practice" offered by Plaintiff – that Defendants retain salespersons like Plaintiff instead of firing and hiring a new wave of salespersons (*see* Pl's Memo in Opp. at 30) – would not be a viable option for Defendants' Healthcare Division because Defendants did not rehire new salespeople due to the financial condition of the Division.

To establish an adverse impact on employees over age forty, Plaintiff asserts that the challenged practice affects 83% of the sales divisions's terminated employees, while the balance of Defendants' terminations affected only 40% of those over age forty. (Pl's Memo. in Opp. at 29-30). Defendants assert that "[t]his alleged statistical evidence of age discrimination is meaningless" and challenges Plaintiff's statistics on several grounds. (Def's Reply at 22-26).

In *Simpson v. Midland Ross Corp.*, 823 F.2d 937 (6th Cir. 1987), the Sixth Circuit articulated the guiding principles for the use of statistics to demonstrate age discrimination:

> Statistics gain relevance in one of two ways: the statistics, standing alone, reasonably lead to a particular conclusion validated by human experience, or comparative statistics point out discrepancies in behavior that would cause the average person to scrutinize the employer's motives. Unless the statistics, standing alone or in comparison, are sufficient to lead the mind naturally to the conclusion sought, they have no probative value; they do not move the proof one way or another. "In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters v. United States*, 731 U.S. 324, 340 (1977).

> For statistics to be valid and helpful in a discrimination case, "both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Tinker*, 127 F.3d at 524 (*quoting Simpson v. Midland-Ross Corp.,* 823 F.2d 937, 944 (6th Cir.1987).

*Id*. at 944. If the sample is too small, the statistics have no probative value. *Tinker*, 127 F.3d at 524. In addition, in the context of a reduction in force, statistical evidence is rendered suspect if it utilizes a sample that includes people who quit voluntarily, left under incentive programs, or were not involved in the same reduction in force. *Id*.

Plaintiff admits in his brief that the NCI Healthcare division was too small to lend itself to statistical analysis. (Pl's Memo. in Opp. at 29). Despite this admission, Plaintiff's counsel purports to have performed statistical computations that demonstrate that the challenged practice

27

disproportionately affected employees over age forty.  Plaintiff's counsel, however, cannot merely submit via memorandum contra argument which is necessarily expert testimony that cannot be cross-examined.  "Statistical analyses by plaintiffs' counsel are insufficient evidence to support a prima facie disparate impact case." *Smith v. Allstate Ins. Co*., 2005 WL 1540221, *10  (N.D.Ohio,2005), *aff'd* 195 Fed.Appx. 389 (6th Cir. 2006); *See also*, Johnson *v. United States HHS*, 1992 U.S. Dist. LEXIS 22673, *47 (N.D.Ohio 1992):

> First, plaintiffs' counsel is not and never qualified himself as an expert in statistics. He purports to summarize data, run percentages, and perform statistical computations on data although he is not qualified to do the same and cannot be cross-examined on his background or methods. As such, plaintiffs' attempt to prove a disparate impact case based on their attorney's statistical analysis must fail at the outset.

(*citing Frazier v. Consolidated Rail Corp.,* 851 F.2d 1447, 1552 (D.C.Cir.1988).

Additionally, Plaintiff Graessle's counsel appears to have focused its statistical analysis on the termination rate rather than the retention rate which provides the more appropriate analysis. *Smith*, 2005 WL 1540221 at *10 (*citing Smith v. Xerox Corp.,* 196 F.3d 358, 368 (2d Cir.1999) (affirming summary judgment for defendant employer on ADA, ADEA, and Title VII disparate impact claims; "[t]he questions to be answered are thus what is the composition of the population subject to the reduction-in-force, *what was the retention rate of the protected group compared to the retention rate of other employees,* and how much of a differential in selection rates will be considered to constitute a disparate impact") (emphasis added); *Council 31, AFSCME v. Doherty,* 169 F.3d 1068, 1072 (7th Cir.1999) (affirming summary judgment for employer and noting that retention rate analysis is consistent with EEOC guidelines)).

Moreover, Plaintiff has not explained how the numbers were calculated, has not defined

the comparison groups, and appears to improperly include employees who quit voluntarily and employees who were terminated for reasons unrelated to the 2002 reduction in force.

Because Plaintiff lacks proper statistical analysis, Plaintiff cannot show that the challenged practice has an adverse impact on individuals over forty.  Therefore, Plaintiff has not established a *prima facie* case of disparate impact and Defendants are entitled to summary judgment on this claim.

**C.      State Law Claims**

The Court has granted Defendants' Motion for Summary Judgment on Plaintiff's federal claims.  The Court therefore declines to exercise supplemental jurisdiction over Plaintiff's state law claims for spoliation, breach of contract, promissory estoppel, and public policy.  It is well settled that a District Court may decline to exercise supplemental jurisdiction over state-law claims once it has dismissed all claims over which it possessed original jurisdiction.  *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997).  Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state claims generally should be dismissed. *Id.*; *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992).  Therefore, pursuant to 28 U.S.C. § 1367(c)(3) and (d), the Court will dismiss Plaintiff's state law claims for spoliation, breach of contract, promissory estoppel, and public policy without prejudice.  In addition, for these same reasons, Plaintiff's Motion for Leave to Amend Complaint (Doc. 187), in which Plaintiff seeks to add Defendant Paula Boyer and add a state law claim for fraudulent inducement, is **DENIED** as moot**.**

## V.  CONCLUSION

For all of the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 175), **DENIES** as moot Plaintiff's Motion for Leave to Amend Complaint (Doc. 187), and **GRANTS** Motion for Leave to File Surreply (*Instanter*) in Support of Memorandum Contra Defendants' Summary Judgment Motion (Docs. 188, 190).

The Clerk shall enter a final judgment in this case, dismissing all Plaintiff's age and religious discrimination claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621, Ohio Revised Code Chapter 4112 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) with prejudice.

Plaintiff's state law claims for spoliation, breach of contract, promissory estoppel, and public policy are dismissed without prejudice.

The Clerk shall remove Documents 175, 187, 188, and 190 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

   **/s/ George C. Smith**         
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**